## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NICHOLAS POTTS | * | |
| Petitioner | * | |
| v | * | Civil Action No. RDB-13-3470 |
| | * | |
| WARDEN[1] | * | |
| Respondent | * | |
| | *** | |

## MEMORANDUM OPINION

Respondent moves to dismiss Nicholas Potts' counseled Petition for a Writ of Habeas Corpus for failure to raise cognizable claims and alternatively as unexhausted. (ECF 3). No reply has been filed by Potts. After reviewing the Petition and the Response, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. §2254(e)(2). For reasons set forth herein, the Court SHALL DISMISS and DENY the Petition with prejudice and SHALL DECLINE to issue a Certificate of Appealability.

### Procedural History

On June 28, 2006, Potts was indicted in the Circuit Court for St. Mary's County on charges of first-degree and second-degree murder in the June 11, 2006, death of James "Gus" Choporis at the Bay District Fire Department in Lexington Park, Maryland. (ECF 3-1). Following his arrest, Potts entered pleas of not guilty, not guilty due to lack of criminal

---

[1] The Clerk shall amend the docket to substitute the Warden as the proper Respondent. *See* Rule 2 of the *Rules Governing Section 2254 Cases in the United States District Courts; see also Rumsfeld v. Padilla*, 542 U.S. 426, 434–35 (2004) (writ is directed to the "person who has the immediate custody of the party detained, with the power to produce the body of such party before the court or judge.).''

responsibility, and not competent to stand trial, and was evaluated at Clifton T. Perkins Hospital by the State and by his defense expert, Dr. Linda Rice. (ECF 3-4, p. 2). At a June 2, 2008 competency hearing, defense counsel withdrew its challenge to Potts' competency to stand trial. (ECF 3-1, p. 6). Pursuant to the State's motion, the Circuit Court bifurcated the guilt/innocence phase from the criminal responsibility portion of trial. (ECF 3-4, p. 2).

Following a jury trial, Potts was convicted of first-degree and second-degree murder and acquitted of voluntary manslaughter. (ECF 3-1). Considering Maryland Rule 4-314, the court granted defense counsel's request that the remainder of the case be determined by the court. (ECF 3-4, p. 2). A second hearing to determine Potts' criminal responsibility was heard by the trial court on January 15, 2009. *Id.* The trial court found Potts criminally responsible and on March 20, 2009, sentenced Potts to life imprisonment, with all but forty years suspended, for the first-degree murder conviction. *Id.*

The facts adduced at trial, summarized by the state appellate court on direct appeal, follow:

> Brian Dusch, a senior firefighter, at the Bay District Volunteer Fire Department ("BDVFD") in Lexington Park, Maryland, testified that he was at the fire station on June 11, 2006. The fire station was a two-story building, and the living quarters, including a living room and various other utility rooms, were located on the second floor. Dusch was upstairs on the day in question, working on the computer while a NASCAR race played on the large screen television. At some point, appellant, another senior firefighter that Dusch knew, and the victim, Gus Choporis, entered the room and started watching the race. While they watched the race, appellant was holding a large metal driver golf club. After the race was over, Dusch left the room and went downstairs and went home.
>
> On cross-examination, Dusch testified that he was aware that appellant had been in a serious motorcycle accident some years prior to this. Dusch also testified that appellant's behavior changed after this accident and he further agreed with defense counsel's characterization that appellant's personality had become "somewhat strange or more abnormal than it should have been." Dusch also confirmed that he never saw any altercation between appellant and Choporis.

2

Drew Winners, also a firefighter with the BDVFD, was present at the station on the day in question. Winners had been shopping and, when he returned, he went upstairs and noticed water on the floor outside the bathroom. He encountered appellant and appellant told him that he had cut his hand. Winners also testified that appellant was "sweating, and he was out of breath." Appellant then walked towards the bedrooms that were located in the back of the facility. After Winners went to his room and put away his belongings, he noticed more water on the floor and that some of the furniture was out of place and missing. At this point, Winners went back downstairs and notified one of the sergeants on duty, Travis Bowes.

Travis Bowes, the station sergeant, was on duty on June 11, 2006, when he saw appellant, whom he had known for many years, enter the fire station accompanied by Choporis. Bowes then left the station momentarily, taking a fire truck out for a maintenance drive, and, when he returned, Winners told him that furniture was missing in the upstairs lounge. Bowes went upstairs and noticed water on the floor and that a piece of furniture had been moved. At this point, appellant emerged with his hand bandaged and covered in blood. Appellant claimed that he had cut himself. After appellant walked away, Bowes placed his hand in the water and discovered that it appeared to be a mixture of "water and blood and like a greasy, oily, almost like Simple Green bottle that was sitting on the table next to me."

After appellant walked by him again, carrying a three or four foot shaft, Bowes followed the water trail to the living quarters. The trail split at some point and led to a closed door. Bowes opened the door and discovered bloody rags and the missing furniture. The furniture also had a lot of blood on it. Bowes went downstairs and called the fire chief, Wayne Johnson, and told him of this discovery, as well as that appellant was bleeding, and that the person who came to the firestation with appellant was missing.

Wayne Johnson, the Fire Chief for the BDVFD, testified that he had known appellant since appellant joined the fire department at age fourteen. Johnson also knew the victim, Choporis. On June 11, 2006, after Bowes alerted Johnson about the missing furniture and the blood in the upstairs living quarters, Johnson called Susan Potts, appellant's mother and inquired where appellant was at the time. Susan Potts told Johnson that appellant and Choporis were at the fire station.

Johnson arrived at the fire station and both he and Bowes went upstairs. Johnson saw blood in the bathroom, as well as large water spots on the floor and missing furniture. Appellant was upstairs and he was "sweating a lot," and was not wearing a shirt. Appellant then asked to speak to Johnson alone, and Johnson told Bowes to remain in the living room.

3

Appellant and Johnson then proceeded back to appellant's room and appellant confessed to killing Choporis. Appellant explained that he and Choporis got into a fight. Johnson testified that appellant then said, "I killed him, and then he goes I cut his fucking throat, like that (indicating)." Appellant also told Johnson where the body was located. Johnson told appellant, who had a bloody towel wrapped around his arm, to go clean up and that "we'll take care of it." Johnson went downstairs, called the fire warden, and told him to call the police because appellant had just killed someone in the fire station. Johnson then ordered everyone out of the fire station. Johnson waited across the street until police arrived.

On cross-examination, Johnson testified that he had known appellant for a long time and that appellant was one of his best firefighters. Johnson knew that appellant had been involved in two motorcycle accidents at some point prior to this incident. After the first accident, appellant broke his arm and was in a lot of pain. After the second accident, appellant was hospitalized for a while and was in a wheelchair. Johnson testified that appellant's personality changed and he became "[v]ery quiet, and didn't come around as much." Appellant was not "his regular self," was not as much the "fun loving, happy guy," and "wasn't, you know, as open with us as he used to be."

Johnson also testified that, exactly one week to the day before the murder, he went to appellant's home and noticed that appellant had grown his hair long and was "very quiet. We had to basically force conversation out of Nick." Johnson, who testified that he had a sort of father-son relationship with appellant, attempted to touch appellant's hair, and appellant pulled away. Johnson said this was unusual because "you could hug Nick" and that "we're very close." Johnson also testified that appellant normally had a shaved head and so the long hair was unusual.

Johnson further testified on cross-examination that when appellant told him "I cut his fucking throat," appellant's eyes were "very strange," that "it was like nobody's there," and that "[i]t didn't look - it wasn't him." Appellant never threatened Johnson on the day in question, and although Johnson saw blood on appellant's right hand, he did not see a weapon.

Detective David Yingling, of the St. Mary's County Sheriff's Office, responded to the call concerning a homicide at the BDVFD fire station. After setting up a perimeter and shutting down nearby traffic, Detective Yingling saw appellant come out of the station, drinking a beer and smoking a cigarette. Detective Yingling ordered appellant to place his hands in the air. Appellant did so momentarily, then took a drink of beer and took a "drag" off the cigarette and then told the officer not to shoot. Appellant surrendered and was placed in handcuffs. When he was asked if anyone else was in the fire station, appellant replied "yeah, but the other one is dead." Detective Yingling then saw blood on

appellant's hands and handed him over to another officer.

Detective Yingling and four or five other officers entered the fire station and proceeded to the second floor. After describing the scene, including the blood on the floor and the walls, as well as a window that had been broken from the inside, Detective Yingling and the other officers found the victim, wrapped in sheets, inside a closet.

Sergeant Cara Grumbles responded to the fire station at 7:43p.m. and, after speaking to several firefighters, she saw appellant come out of the ground level of the fire station. Testifying similarly as Detective Yingling concerning the arrest, Sergeant Grumbles also saw blood on appellant's hands and clothing. There also was blood on appellant's shorts and t-shirt.

Detective Corporal Clayton Safford responded to the scene, and then transported appellant to the police station located about twenty minutes away in Leonardtown. During the drive, appellant repeatedly admitted to killing Choporis. According to Detective Safford, appellant said "I just lost it" and asked the officer "how much time he would get for murder." Detective Safford testified that he did not initiate any conversation with appellant. Detective Safford did, however, ask appellant about the alcohol on his breath, and appellant replied that, after seeing the police "he slammed two beers before he was taken into custody."

When they arrived at the police station, appellant's cut was bandaged and he was allowed to smoke a cigarette before going inside. Detective Safford testified that he did not promise appellant anything, nor did he threaten him prior to taking a recorded statement. Appellant was cooperative during the entire interview. Appellant's transcribed statement and a recording were admitted into evidence and played for the jury.

In that statement, appellant indicated that, after watching the NASCAR race, the victim asked him about money that appellant owed him. The victim then asked that appellant buy him a soda. Appellant did so, and when he returned, the victim was playing with a knife. According to appellant, the victim stated that "[m)an, people like you, I could make disappear, so quick." Then, after the victim called appellant a "punk," the victim pushed appellant. At this point, appellant grabbed the golf club and hit the victim in the head. The victim then came at appellant with the knife, and appellant grabbed the knife and threw it on the floor. Appellant then pulled out his own knife and cut the victim's throat. After hiding the victim's body in a closet, appellant confessed to Fire Chief Johnson.

Appellant claimed that he was in "a state of rage," during the incident. Further, instead of leaving when the victim pushed him, appellant explained "I just let everything build up, and I exploded, you know, shouldn't, you know.

5

Ahm, (pause), shit in the past, you know. Everything is built up, you know. He's a, he was aggressive, but, you know, I mean, he's always fucked with me, you know."

Towards the end of the interview, Detective Safford indicated that"[w)hat I'm having a problem with is, what set it off." Appellant stated the push and "then, you know, I just let it go, you know." After Detective Safford asked what caused the victim to push appellant, appellant replied:

> I don't know. I mean, he was saying something, and I was like, I think there was a, you know, like, what the fuck ever, or, you know, I said something, because he was, you know, totally disre, (cough), disrespecting me, I mean, I didn't even say anything smart to him, like sometimes, you know, I'll throw something at him, like, Man, grow up, or something like that. But, you know, just dumb shit. And, (pause), I guess, you know, that's how it started, and it just built up inside of me, after I let it go, you know, after the shove, and I let it go. I was like, Man, I ain't, you know, I ain't gonna let the man punk me, you know, I ain't gonna let him, (pause) do that. I just should've let it go, but I just snapped, you know. I never ever do that, so.

Detective Safford then testified to the collection of evidence from the crime scene, including the location of the victim, Choporis, as well as the recovery of a golf shaft and a driver head for the golf club. Detective Safford also recovered a folding knife from appellant's shorts. A second knife, with blood stains, was also recovered from appellant's shorts.

Dr. Carol Allen, assistant medical examiner, testified that she conducted the autopsy of Choporis. There were a total of fifty-six sharp force injuries to the victim's body. There were seventeen cutting wounds to the head, and thirteen cutting wounds to the neck, including a gaping cutting wound to the neck that ran through the external and internal jugular veins. There was also a cut to the right carotid artery, the main artery from the heart to the brain. There were more wounds to the back of the victim's head, as well as both arms and hands. Dr. Allen also observed blunt force injuries to the back of Choporis's head, and testified that the injuries could have been caused by a golf club. This injury, standing alone, could have been fatal. The cause of death was both sharp and blunt force injuries.

On cross-examination, Dr. Allen confirmed that there was cocaine in the victim's urine. Dr. Allen could not say how recently the victim had used cocaine. Dr. Allen further testified that whether a person who had used cocaine would act different, have a high pain threshold, or would act aggressively depended on the individual. Following Dr. Allen's testimony, the State rested its case-in-chief.

After the court denied appellant's motion for judgment of acquittal, and, as will be discussed in more detail *infra,* after the court ruled that evidence concerning imperfect self-defense could be admitted, the jury heard first from appellant's father, Nicolas Potts, II. In June 2006, after appellant's father was contacted by appellant's boss, appellant's father took him to see a neurologist. This visit with the doctor occurred approximately four days prior to the underlying incident in this case.

Appellant's father then explained that it was difficult to get appellant to go to the doctor. The night before, while he was telling appellant that he needed to go, appellant went into his own bedroom and retrieved a knife. Appellant told his father that his mother and Choporis were going to get the knife because appellant thought they were "putting needles in his neck." After his father told appellant to put the knife away, appellant went into his bedroom, screamed at no one in particular, then came back out and threw a vase onto the floor. Appellant's father testified that he had never seen appellant scream like that before, and that he "knew that something was wrong then." Appellant eventually agreed to go see the doctor. The neurologist scheduled a number of tests that were to occur on Monday, which would have been the day after the murder.

Margaret Yoder had known appellant since birth. She was aware that appellant sustained head, arm and leg injuries in a motorcycle accident that occurred in 2005. Prior to that accident, appellant was a "very kind, gentle person." After the accident, around Memorial Day, Yoder came to the house appellant shared with his mother, and appellant was very quiet and "seemed like all to himself." At one point, appellant started tamping down all four sides of a pack of cigarettes. When Yoder asked what he was doing, appellant claimed he could not smoke them because someone was going to kill him. Yoder also testified that, while normally appellant was "always kind of neat," on this occasion he had let his hair grow out, was dressed "kind of sloppy," and his "hygiene wasn't as good as it had been before." Yoder agreed that appellant's personality had changed after the motorcycle accident.

William Keffer, appellant's uncle, testified that, after the motorcycle accident, appellant became "lackadaisical." Keffer also stated that, while prior to the accident he taught appellant how to hang drywall, after the accident, appellant had to relearn these skills. Keffer was also contacted by appellant's mother, about a week before the murder, and was asked to take appellant to see the neurologist. Keffer further testified that, following the motorcycle accident, appellant was in the hospital for a month, and that recovery took two to three months. During the accident, appellant sustained injuries to his arm, leg and head. Keffer testified that the injury to appellant's head occurred "where it cracked the helmet on him." On cross-examination, Keffer confirmed that he saw appellant on the day of this underlying incident and appellant's behavior

"seemed to be fine."

Jude McDowell, one of appellant's friends and fellow firefighter, testified that, after the motorcycle accident, "things did change." Appellant was no longer a "happy-go-lucky type of guy," but became "a little more reserved and withdrawn, like I said, harder to talk to, harder to make eye contact with him." McDowell agreed that, after the accident, "it was definitely a big difference in personality" and "slowly deteriorated."

Gerard Campbell, another friend and fireman, testified that, prior to the motorcycle accident, appellant was "[h]elpful, calm. Normal, average person, you know," and an excellent fireman. After the accident, appellant was unable to "concentrate on conversations, just blurt out laughing, not able to, you know, look you eye to eye." Appellant would listen to parts of conversations, "and then it was like he wasn't even there, you know." Even during trial, appellant did not look like the same person Campbell knew before. On cross-examination, Campbell confirmed that appellant was still able to work as a firefighter and agreed with the prosecutor that "he still was someone you would want with you when you were fighting a fire."

Melissa Johnson, a former fiance of appellant's, testified that appellant was in a motorcycle accident in April 2005. Appellant sustained broken ribs, a shattered ankle and needed surgery on his arm. Appellant also suffered a concussion. Appellant's behavior changed and he "was just very irritable, very irritable." Appellant also started to yell all the time and "get mad for no reason." After appellant and Johnson broke off the engagement, Johnson was aware that appellant was involved in a second motorcycle accident.

Jaclin Harris testified that appellant was good friends with her husband and that she had known him for about eleven years. Before his motorcycle accidents, appellant was "very nice," had a "warm personality," and was "soft-spoken." Harris knew that appellant was involved in motorcycle accidents, one of which required him to be hospitalized at the Shock Trauma Center in Baltimore. After the accident, Harris noticed a gradual change in appellant's personality. Appellant grew out his hair, stopped shaving, and was "sloppy." This was unusual for appellant. Harris saw appellant a couple weeks before this incident and testified appellant "was not the same person he was before."

After a hearing outside the presence of the jury, defense counsel then called Dr. Linda Rice, accepted as an expert in the field of neuropsychology. Dr. Rice first evaluated appellant while he was detained in the St. Mary's County Detention Center. Administering a series of tests, Dr. Rice testified that appellant was "very confused," "disorganized in his thinking," "had really no emotion," and "gave very simplistic answers, answers that we would determine impoverished in content." She also thought appellant seemed "paranoid," was "frightened," and did not seem "very trustful of me." Dr. Rice decided to

8

conclude the testing at this time.

Later, in late November and early December 2008, Dr. Rice retested appellant in a series of extensive tests that took approximately ten to twelve hours in total. These tests, such as an IQ test, were designed to test appellant's cognitive function. Appellant performed poorly on the IQ test, with Dr. Rice testifying that ninety-six percent of individuals his age would have performed better. Appellant also scored poorly on a working memory test, an attention functions test, and a visual memory test. Appellant was in the borderline range for semantic memory and was average for episodic memory.

Dr. Rice then tested appellant's frontal lobe functioning, which she explained are the functions that "basically decide for us everything that's gonna happen." These functions decide emotions and how individuals act on those emotions. Appellant showed impairment in these functions, and "[s]pecifically, he showed impairment in being able to solve problems." He also "showed difficulty inhibiting his reactions." On one such test meant to determine appellant's ability to control his reactions, he scored in the second percentile with ninety-eight percent of the population performing better than him.

Dr. Rice also was given a history of appellant through appellant's mother and learned that he had a "difficult birth" where he stopped breathing and had to be revived. Appellant also had trouble in school as a child, and was currently only reading at a fourth to six grade level. He had similar troubles with mathematics and spelling. Dr. Rice considered this important in her diagnosis because these early deficits made him more vulnerable to further difficulty caused by the concussions sustained in the motorcycle accidents: Dr. Rice specifically testified:

> I think Mr. Potts, considering that he has this childhood history of learning disabilities, low IQ, not much brain power to start with, not a lot of cells to lose, not a lot of connections to spare, on top of having repeated concussions, I think his damage is fairly severe.

After Dr. Rice was excused, the defense recalled Detective Safford. Detective Safford did not recall learning that the victim had cocaine in his system, but agreed that would be of interest. Detective Safford admitted that the victim's fingernail clippings were not tested, and also agreed that appellant stated that the assault began after the victim emerged from the bathroom. Detective Safford confirmed that appellant stated that the victim was holding a knife, and that, according to appellant, the victim stated that appellant was a "punk" and that he could make him "disappear." Appellant also stated that the victim then pushed him. Detective Safford also testified that he contacted Susan Potts, appellant's mother, and she informed him that the larger of two knives recovered from the scene belonged to the victim. Detective Safford also indicated that the

9

golf club was recovered in two pieces, *i.e.*, the shaft was separate from the driver head, but that he did not know the condition of the club prior to its recovery.

On cross-examination, Detective Safford testified that he saw no evidence that cocaine was being used in the fire station. Further, during his interview, appellant appeared to understand and respond appropriately to the officer's questions. Indeed, at one point during his statement, appellant corrected Detective Safford about where pieces of the couch originated.

Finally, appellant recalled William Keffer, appellant's uncle. Keffer, who was appellant's employer, testified that he would pick up appellant and take him to and from work. Although appellant had a driver's license, appellant was "[j]ust scared of driving."

(ECF 3-4, pp. 3-17).

On direct appeal, Potts raised four claims:

1. Did the trial court err in failing to conduct a *Frye/Reed* hearing[2] concerning defense expert Dr. Linda Rice?

2. Did the trial court err by instructing the jury on the issue of imperfect self-defense?

3. Did the trial court properly ask the venire whether they knew appellant's mother? and

4. Did the trial court properly confirm appellant's desire to waive his right to have a jury determine his criminal responsibility?

(ECF 3-2, pp. 1-2; *see also* ECF 3-3 and 3-4). On July 31, 2012, the Court of Special Appeals of Maryland affirmed the judgment of conviction. (ECF 3-4). Potts then filed a self-represented petition for writ of certiorari based on the same four issues reviewed on direct appeal. (ECF 3-5). On November 19, 2012, the Court of Appeals of Maryland denied further review. (ECF 3-6). Pott's judgment became final for direct appeal purposes

---

[2] As noted in the Court of Special Appeals opinion, the admissibility of expert testimony concerning scientific or forensic evidence is governed in Maryland by the *Frye-Reed* standard, which provides that scientific techniques can be admissible if they are "generally accepted" in the scientific community. ECF 3-4, p. 17, n. 2; *see also Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); *Reed v. State*, 283 Md. 374 (1978), cited in *Fleming v. State*, 194 Md. App. 76, 100 (2010).

on February 19, 2013, when the time for seeking review in the United States Supreme Court expired. *See* Sup. Ct. Rule 13.1 (petition for writ of certiorari to be filed within 90 days of the date of judgment from which review is sought). To date, Potts has not initiated post-conviction proceedings in the Circuit Court. (ECF 3-1).

On November 19, 2013, Potts, through counsel, filed the instant Petition, alleging generally that "his constitutional right to be competent to advise counsel of his desires at trial were not protected under recent [S]upreme [C]ourt decisions." (ECF 1, p. 2). Potts offers no further illumination as to his desires and cites no Supreme Court law. He does, however, present four allegations of trial court error, to wit:

1. Did the trial court err in not giving the defense the option of arguing criminal responsibility last, or after the State argued criminal responsibility, to the trier of fact?

2. Did the [trial court] have to make a finding that a defendant was able to assist his counsel in a bifurcated trial involving the defenses of insanity and lack of criminal responsibility?

3. When a defendant is marginally competent on the day of trial and has a history of incompetency prior to trial, is a defendant's inability to testify in his own defense at trial grounds for a new trial? [and]

4. Is a [t]rial [c]ourt required to make an independent finding of a waiver of presentation of criminal responsibility to the jury when a defendant initially elects to make a criminal insanity to the jury and initially indicates his desire to have the jury determine criminal responsibility?

(ECF 1, p. 3).

## Discussion

Respondent seeks dismissal of this 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus, arguing first that the claims presented are not cognizable on federal habeas review and, alternatively, that the claims have not been exhausted by fully presenting each claim to the state courts. (ECF 3). The federal habeas statute authorizes a federal court to entertain a

11

state prisoner's habeas petition "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254 (a). Absent violation of a Federal constitutional right, a habeas petitioner fails to state a cognizable claim for relief. *See Wilson v. Corcoran*, 562 U.S. 1, ___, 131 S. Ct. 13, 14 (2011) ("Federal courts may not issue writs of habeas corpus to state prisoners whose confinement does not violate federal law."); *Spencer v. Murray*, 18 F.3d 237, 239-40 (4th Cir. 1994) (where petitioner complained about the admissibility of evidence, without citing any constitutional provision or mentioning any constitutional right that was infringed, no federal claim was stated). None of Potts' claims alleges abridgement of a constitutional right or federal law. Notably, all his claims are premised solely on a violation of Maryland law, not federal law.

In habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also Cagle v. Branker*, 520 F.3d 320, 324 (2008). "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 480. A violation of state law which does not infringe upon a specific constitutional right is not cognizable on federal habeas review unless it amounts to "fundamental defect which inherently results in a complete miscarriage of justice." *Hailey v. Dorsey*, 580 F.2d 112, 115 (4th Cir. 1978) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

In short, Potts has failed to state a cognizable habeas corpus claim and his Petition shall be denied and dismissed. Further examination as to exhaustion of those claims pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982) is, therefore, unnecessary.

Potts may not appeal the dismissal of his Petition absent a Certificate of

Appealability. A Certificate of Appealability shall not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that reasonable jurists would find that an assessment of the constitutional claims is debatable and that any dispositive procedural ruling dismissing such claims is likewise debatable. *See Miller–El v. Cockrell*, 537 U.S. 322, 336–38 (2003); *Rouse v. Lee,* 252 F.3d 676, 683–84 (4th Cir. 2001). Potts has failed to state any constitutional claims, and reasonable jurists would not find the dismissal of his Petition based on such failure debatable.

For these reasons, the Court will dismiss the Petition without prejudice for lack of exhaustion and finds no grounds to issue a Certificate of Appealability. A separate Order follows.

December 8, 2014
Date

/s/ Richard D. Bennett
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE